SOUTHWEST BRANCH OF RURAL RECIPROCAL TELE-
PHONE CO., Respondent, v. DAKOTA CENTRAL
TELEPHONE CO., et al, Petitioners.

(220 N. W. 475.)

(File Nos. 6059, 6060.   Opinion filed July 7, 1928.)

*Null & Royhl,* of Huron, for Petitioner Dakota Central Telephone Co.

*Boyce, Warren & Fairbank,* of Sioux Falls, for Petitioner Dell Rapids Telephone Co.

*Buell F. Jones,* Attorney General, and *Raymond L. Dillman,* Assistant Attorney General, for Board of Railroad Commissioners.

MORIARTY, C. This matter comes before the court by the consolidation of two proceednigs originating in writs of certiorari granted by this court, and directed to the board of railroad commissioners of this state.

The material facts are as follows:

At all times involved herein the Dakota Central Telephone Company has maintained and operated a telephone exchange in the city of Flandreau, the county seat of Moody county, and the Dell Rapids Telephone Company has maintained and operated an exchange in the town of Trent, which is situated about twelve miles southwesterly from Flandreau. Each of these companies also maintained and operated certain rural telephone lines connected with its own exchange. Subscribers on the rural lines of the Dakota Central Company were connected with Flandreau, but could not communicate with Trent or Dell Rapids without paying a toll charge.

Subscribers on the rural lines of the Dell Rapids Company were connected with Trent and Dell Rapids, but could not communicate with Flandreau without paying toll.

Certain farmers in territory tributary to Trent and Flandreau, and who desired telephone connection with both these places, formed an association by contributing to a fund which was used to erect a telephone system, one line of which was brought to the corporate limits of the city of Flandreau and another terminal of which was brought to the corporate limits of Trent.

This association operated under the name of Southwest Branch of Rural Reciprocal Telephone Company. After bringing its lines to the corporate limits of Flandreau and Trent, as above stated, this association applied to the board of railroad commissioners for an order directing and requiring the Dakota Central to connect the association's lines with the Dakota Central exchange at Flandreau, and directing and requiring the Dell Rapids Company to connect the association lines with the exchange at Trent, and requiring each of said exchanges to perform the necessary switching services for the said association lines.

At the time this application was made, the Southwest Branch of Rural Reciprocal Telephone Company was not incorporated, but its application included a statement that the intention was that, as soon as the desired connections were secured, the members of

the association would turn their lines over to the duly incorporated Rural Reciprocal Telephone Company, and take stock in that corporation.

The board ordered a hearing on the aforesaid application. At the original hearing, and at an adjournment thereof, both the Dakota Central Company and the Dell Rapids Company were represented by counsel, and evidence was submitted for the applicant association and on behalf of the resisting telephone companies.

As a result of these hearings, the board recorded its formal report, including its findings of fact, and entered its order granting the application. The resisting telephone companies petitioned for a rehearing, which was denied by the board. Thereupon the resisting telephone corporations, who will hereafter be referred to as the petitioners, sued out the writs now before this court.

The record sent up by the board shows that the board found that the lines of the applicant association are in proper condition to be connected; that such lines have been constructed to the corporate limits of Flandreau and Trent; that public convenience and necessity require, and public service demands, that physical connection for switching purposes be made with the exchanges at Flandreau and Trent as applied for; that each of the petitioners should be required to bear all necessary cost and expense of connecting the applicant's lines with its exchange, and that such connection should be made within a reasonable time. The order entered by the board was in accordance with these findings, and it fixed the sum of 18¾ cents per month for each station on the applicant's line as the compensation to be paid to each of the petitioners for switching services.

As to the extent of the review upon writs of certiorari: Section 3002 of the Revised Code of 1919 provides:

"The review upon this writ cannot be extended further than to determine whether the inferior court, tribunal, board or officer, has regularly pursued the authority of such court, tribunal, board or officer."

The briefs of the petitioners present three distinct contentions which we consider within the scope of review prescribed by statute, and as requiring discussion in this opinion. These contentions are as follows:

First. That the board exceeded its authority and abused its

discretion in requiring the petitioners to bear the entire cost of carrying their lines to the corporate limits of Trent and Flandreau and making physical connection with the lines of the association.

Second. That the rate of compensation to be paid to petitioners for switching services, as fixed by the board in its final order, is not sufficient to pay the actual cost of such services, and requires the petitioners to perform such services at a loss, thereby taking their property without due process of law, contrary to the provisions of the Constitution of the United States (Amend. 14) and of the Constitution of the state of South Dakota (article 6, § 2).

Third. That requiring them to furnish switching services for the rural lines of the association at the price fixed by the board requires the petitioners to discriminate in rates for similar telephone services, in that thereby the subscribers on the rural lines of the association would secure telephone services at a lower rate than that charged under direction of the board for the same class of service rendered subscribers on the rural lines of the petitioners.

█ As to the expenses of making the physical connection:

Section 9797 of the Revised Code of 1919, as amended by chapter 294 of the Session Laws of 1919, authorizes the board, upon application for such connection, to "ascertain the facts in the case and if in its judgment the public service demands such connection and the lines of the applicant are in proper condition, such board shall order such connection to be made and shall apportion the expense thereof."

The evident purpose of the statute is the securing of telephone service for the public. The law requires the applicant seeking connection and switching service to bring its lines to the corporate limits of the city or town in which the exchange is situated. These lines must also be properly constructed and in proper condition to be connected up. The record in this case shows that the applicant association has constructed several miles of line on each of the ends prepared for connection between the phone of its nearest subscriber and the corporate limits. We cannot say that the board abused its discretion in requiring the petitioners to bear the entire cost of meeting the applicant's lines at the corporate limits.

█ As to the petitioners' cotention that the final order of the board requires them to furnish switching services at a loss to them and therefore results in taking of their property without due process of law, the record shows the following facts:

The findings of the board include the following statement:

"The rate prescribed in the statute is a maximum per station rate. It was the evident intent of the Legislature to establish a reasonable, average maximum rate which would fairly meet the average cost of switching service throughout the state. The record is not sufficiently exhaustive to convince the board that the prescribed rate is too low to meet such intent."

The petitioners insist that the evidence submitted is sufficient to show conclusively that the rate is too low to cover the actual cost of the services; that such evidence is wholly undisputed; and that the board abused its discretion and exceeded its jurisdiction in fixing the switching rate at $2.25 per year, contrary to all the evidence before it.

The evidence referred to consists of tabulations resulting from so-called "studies" made by employees of these petitioners. In preparing these tabulations, the compilers have charged to the switching cost a certain share or per cent of the cost of maintaining and operating the exchange. The share or per cent so charged is determined by ascertaining the comparative number of calls on rural and urban lines, and charging the rural switching with that proportion of maintenance and operating costs. In this list of costs they include salaries of operators, rent, heat, and light, janitor service, interest on investment, including investment in land on which exchange stands, depreciation, repairs, taxes, income collection, income accounting, a large charge for "General Office Expenses," and various other charges.

To make some of these tabulations, the petitioners selected certain stations of their own choosing, accumulated their data for the six months from December 1, 1919, to May 31, 1920, making no explanation of their reason for selecting that remote period, or for confining their data to that season of the year when heat, light, and janitor services are most expensive.

There was no proof whatever that the furnishing of switching services for the connection ordered would require the employment of additional operators, greater expenditure for heat, light, janitor service or rent, or that investment, taxes, depreciation, or any other item would be required to be increased in the proportions shown in the tabulations. Unless there is evidence to show that the expenses will be increased by an amount in excess of the compen-

sation provided for, there is no proof of loss from the enforcement of the board's order.

The tabulations merely tend to show that the compensation fixed by the board's order is less than the average cost of switching at the times and under the conditions covered by the data. This falls far short of proving that the enforcement of the order will cause an actual loss to the petitioners.

In its report in this proceeding, the board includes the statement that:

"The evidence further indicates that up to a certain point switching service can be furnished at an exchange without appreciably increasing the operating expenses of such exchange, and that between certain limits, the cost per service station of furnishing such service is materially reduced by an increase in the number of stations served."

The board was fully justified in making this deduction from the evidence and in finding the record insufficient to show that compliance with the order would result in a loss to either of the petitioners.

Only such errors as appear on the face of the record can be reviewed on certiorari. Van Den Bos v. Board, 11 S. D. 190, 76 N. W. 935.

"The writ does not lie to correct errors of law, such as may arise in passing upon the competency or sufficiency of evidence, where jurisdiction or authority is given to pass upon the questions involved." Austin et al v. Eddy, 41 S. D. 640, 172 N. W. 517.

As to the contention of petitioners that the board's order requiring switching service to be furnished at the rate fixed "results in direct discrimination in favor of the connecting lines and against the company and its subscribers in the exchange area":

Section 9798, Revised Code of 1919, provides:

"No person or telegraph or telephone company shall unjustly discriminate either between persons or companies in the switching, transfer or delivery of messages; nor shall any such company make different rates for its subscribers for the same class of service in any city or town where it is operating."

In arguing their contention on this point, counsel for petitioners say:

"In the case at bar it appears that the Rural Reciprocal Telephone Company is furnishing rural service for $1 less per annum than the Dakota Central is supplying rural service to its subscribers for. As a matter of fact, they could afford to furnish service for about $3 less than what the Dakota Central must charge its rural subscribers. This results in a direct discrimination in favor of the connecting lines and against the company and its subscribers in the exchange area."

Section 9798, R. C., has no application to the conditions involved herein. That section deals with charges which a telephone company makes for service to its own subscribers.

By the enforcement of the board's order, users of the association phones do not become subscribers of either of the petitioners. They remain subscribers of the association, and those of them who testified at the hearing testified that they were willing to pay the cost of switching in addition to the existing charge.

If there is any necessity for regulation of rates between competing companies, that is a matter not involved herein. If the users of association phones are required to pay the switching charge in addition to the charge of $14 per year, they will have to pay more than the users of petitioners' phones.

The board having found that public convenience and necessity require, and public service demands, that the lines be connected, and there being ample evidence in the record to support that finding, and the record failing to show that the board proceeded irregularly or exceeded its jurisdiction in making the order involved herein, the said order and the proceedings of the board upon which the said order is based are hereby affirmed.

BURCH, P. J., and POLLEY, SHERWOOD, and BROWN, JJ., concur.

CAMPBELL, J., dissents.